IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

IN RE:

Sea Village Marina, LLC,

                    Debtor.

_____

Sea Village Marina, LLC,

            Appellant,
      v.

John B. Allen, et al.,

            Appellees.

HON. JEROME B. SIMANDLE

Civil No. 12-2479 (JBS)

ON APPEAL FROM AN ORDER OF THE
UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

[Case No. 10-17235/JHW]

**OPINION**

APPEARANCES:

Albert A. Ciardi, III, Esq.
Nicole M. Nigrelli, Esq.
Daniel S. Siedman, Esq.
Ciardi Ciardi & Austin PC
One Commerce Square
2005 Market St., Suite 1930
Philadelphia, PA 19103
      Attorney for Appellant Sea Village Marina LLC

John B. Allen
1344 Radburn Court
Romansville, PA 19320
Pro Se

Steve Smith
125 Margate Blvd.#A10
Northfield, NJ 08225
Pro Se

Maryanna and Dennis Rotella
1790 Somers Point Rd.
Egg Harbor Township, NJ 08234
Pro Se

James A. Sanceciz
125 Margate Blvd.
Northfield, NJ 08225
Pro Se

Paul F. and Sharon Swiercynski
225 Burleigh Dr.
Somerdale, NJ 08083
Pro Se

**SIMANDLE,** Chief Judge:

## I.   Introduction

This action comes before the Court on an appeal from the Bankruptcy Court's issuance of an order on March 16, 2012 ("March 16, 2012 Order") [Docket Item 1-2] in Bankruptcy Action No. 10-17235 allowing certain proofs of claim pursuant to 11 U.S.C. §§ 502(a) and (b). Appellant, Sea Village Marina ("SVM"), operates a community of floating homes or houseboats in Egg Harbor Township, New Jersey. Conditions at the marina have deteriorated; the residents currently suffer from a lack of potable water, docks in disrepair, and homes that tilt at uneven angles because they rest on mud at low tides. SVM filed for bankruptcy under Chapter 11. The Bankruptcy Court's Order allows general unsecured claims from certain houseboat owners who lost value in their homes due to degraded conditions at the marina.

SVM has appealed the portions of the March 16, 2012 Order that granted general unsecured claims to five different SVM homeowners for loss of value in their homes. The aspects of the

2

Order that SVM has appealed are: (1) Claim # 21 (Paul F. and Sharon Swiercynski), allowing a general unsecured claim in the amount of $45,250.00; (2) Claim # 23 (Maryanne and Dennis Rotella), allowing a general unsecured claim in the mount of $33,000.00; (3) Claim # 24 (Steve Smith), allowing a general unsecured claim in the amount of $37,450.00; (4) Claim # 25 (John B. Allen), allowing a general unsecured claim in the amount of $67,000.00; and (5) Claim # 27 (James A. Sanceciz), allowing a general unsecured claim in the amount of $33,000.00.

For the reasons explained herein, the Bankruptcy Court's Order will be vacated and the case will be remanded with instructions for the Bankruptcy Court to provide further explanation regarding the cause of action that serves as the basis for relief, the Claimants' showing of causation, and the Bankruptcy Court's calculation of damages.

## II.  A Related Case Before This Court

In 2009, SVM filed before this Court an in rem action, Sea Vill. Marina, LLC v. A 1980 Carlcraft Houseboat, Hull ID No. LMG37164M80d, Civil Action No. 09-3292 (JBS-AMD), 2009 WL 3379923 (D.N.J. Oct. 19, 2009), to obtain maritime liens against multiple houseboats whose owners had not paid dockage fees since 2007 ("the maritime lien litigation"). The owners were participating in a rent strike against SVM due to SVM's failure

3

to provide certain necessary services, such as potable water. After first determining that subject matter jurisdiction was proper because the houseboats were vessels subject to maritime jurisdiction, the Court then determined that the maritime liens were proper because "some amount is reasonably owed by the vessel owners, even if it is small." Sea Vill. Marina, LLC v. A 1980 Carlcraft Houseboat, 09-3292 (JBS AMD), 2010 WL 338060, at *12 (D.N.J. Jan. 26, 2010).

At one of the hearings regarding the maritime liens, the Court became concerned that "the Verified Complaint contained claims for liens in amounts that were materially false, and that [SVM] submitted statements of account containing knowingly inflated amounts of indebtedness." Id. at *12. The Court ordered a show cause hearing to address these concerns. Before the show cause hearing occurred, SVM filed a voluntary petition for bankruptcy. The Court then issued an order staying the maritime lien case, including any pending motions for sanctions, pending developments in the Bankruptcy Court. The maritime lien case is still stayed.

## III. Factual Background

The Swiercynskis, the Rotellas, Smith, Allen, and Sanceciz all filed claims in the SVM bankruptcy proceeding. The claims were similar. They stated that the creditor owns a floating home

4

purchased and located at SVM. The claims then list affirmative defenses, which appear related to the maritime lien litigation, not the bankruptcy case. For example, the Claimants assert affirmative defenses that the floating homes are not vessels; that the court lacks subject matter jurisdiction; that plaintiff SVM did not rely upon the credit of the floating home; and that the materials and services provided by plaintiff SVM are not "necessaries" within the meaning of the Federal Maritime Lien Act. The claims also assert that SVM breached contracts with the Claimants. They assert that SVM defrauded the subject vessels and their owners by inducing the owners to purchase the vessels, inducing them not to sell the vessels when a resale market existed, and making false statements regarding plans to improve the marina's facilities. During the hearings upon these claims, a related theory of recovery appears to have emerged, namely, that the Debtor SVM breached its duty to these Claimants to maintain the marina premises in tenantable condition and good repair, causing loss of the value of the houseboats and, in some cases, inability to resell the Claimant's houseboat.

In support of their claims, several claimants included copies of this Court's Jan. 26, 2010 Opinion in the maritime lien case in which the Court ordered a show cause hearing to determine the veracity of SVM's statements regarding monies owed and in which the Court held that SVM's maritime liens against

the houseboats were proper because the subject homeowners in that case owed some money to SVM in an amount to be determined. The only Claimant in the bankruptcy case whose vessel is also involved in the maritime lien case is John B. Allen, who filed Claim # 25.

SVM filed the Second Omnibus Objection of the Debtor and Debtor-in Possession to Certain Proofs of Claim and challenged the houseboat owners' claims. SVM argued that the homeowners had no basis to support their claims.

The Swiercynskis, the Rotellas, Smith, Allen, and Sanceciz then filed responses to SVM's objection. They noted that SVM had not fulfilled its promises to repair and maintain the marina. Many of the Claimants attached photographs showing conditions at the marina. Several homeowners, such as the Rotellas, also attached property listings for houseboats in other places, such as Seattle, Wash. or Sausalito, Cal. For one such listing, the Rotellas wrote a note, "NOTICE CONDITION OF DECKS ETC AND THE COST TO THE TENNANT [SIC] IS FAR LESS DON'T HAVE TO WAIT FOR REPAIRS MARINA PRISTINE." (Rotellas' Answer to Second Omnibus Objection, Tab 8, Appellate Record.) The Rotellas also attached a September 7, 1986 New York Times article, "Houseboats Emerge as a Cheaper Form of Housing." (Id.) Several Claimants noted improvements they had made to the boats and monthly expenses. For example, the Swiercynskis attached an excel chart listing

6

expenses for docking, insurance, registration, sewer, repairs, and legal from 2005-2011. (Swiercynskis' Answer to Second Omnibus Objection, Tab 7, Appellate Record.)

Several Claimants also attached a survey conducted of Claimant Smith's home in which the surveyor found that Smith's home had lost almost all of its value. This survey was also referenced repeatedly at the hearing before the Bankruptcy Court. Because the survey is relevant evidence regarding loss of value, the Court has summarized it extensively.

On September 27, 2011, Captain Rob Cozen, a marine surveyor and consultant, inspected the floating home of Stephen Smith and wrote Smith a letter summarizing his findings. (Tab 8, Appellate Record, attached to Rotella's Resp. to Second Omnibus Objection.) Cozen noted that Smith had purportedly purchased his home on May 20, 2004 for $107,000 and, at that time, the home appraised for $107,000. (Id. at 1.) According to Cozen, Smith had also purportedly entered into a long term lease with SVM that "guaranteed the provision of essential services (water, sewage, security, etc), recreational amenities and facilities, as well as a high standard of ongoing maintenance of the overall marina complex." (Id.)

Cozen's letter stated that SVM "has been grossly negligent" in providing the services. (Id.) Cozen then outlined the poor conditions at SVM, including lack of potable water, lack of

7

dredging to ensure that the homes continually float on water, and docks that are in disrepair. The fresh water system is contaminated. (Id.) The salt and mineral content of the water supply is so high that it has corroded, clogged, and rendered plumbing systems unusable. (Id.) The condition (and ongoing maintenance) of the bulkheads, walkways, and ramps is substandard and, in some locations, "should be considered unsafe." (Id.) There is no ongoing dredging program to remove the build-up of mud beneath the homes and, as a result, "the majority of the floating homes sit either partially or completely out of the water twice a day at mid-to-low tide." (Id.) When the homes are resting on mud, instead of water, they can tilt and there is "significant stress on the wood and fiberglass foundation" that can cause structural damage. (Id.)

        Cozen's letter then addressed the value of Smith's home. Cozen noted that "this floating home was purchased at the height of the real estate bubble," and that "when the real estate market began to collapse, these floating homes also lost a good percentage of their value." (Id. at 2.) Cozen asserted that the decline in value "was further exacerbated by the . . . deplorable conditions at the marina." (Id.) Cozen also stated that "[t]he situation is worsened by the fact that, even if the owners chose to move out of Sea Village Marina, there is no other marina or facility on the east coast that will accept

them." (Id.) Cozen noted that all of the homes are 30 years old and that Smith's home "sits on it's [sic] original foundation that had a life expectancy of 20+- years (in good conditions)." (Id.) Cozen stated that all the SVM homes are selling for 40-50 percent less than their previous values. He noted that Smith cannot sell or rent the home independent of SVM's management, that the ongoing litigation requires that profits from any sale must go directly to Sea Village for back rent. Cozen concludes that "[t]aking all of these conditions into account, your floating home has virtually lost most or all of it's [sic] market value." (Id.)

After the parties made their submissions, the Bankruptcy Court held a hearing that, inter alia, assessed the SVM homeowners' claims. The Swiercynskis, the Rotellas, Smith, Allen, and Sanceciz all testified under oath. The homeowners lacked representation; they were examined by the Bankruptcy Court and cross-examined by SVM's counsel. They described SVM's broken promises that dredging would occur, that the potable water problems would be remedied, and that their houseboats would increase in value. They described frustrating damage to their homes. For example, Smith testified that his plumbing system was corroded and leaking and that he had replaced four

water heaters in eight years. (Hr'g Tr. 54:5-7.) [1] The homeowners described homes that were resting on mud and tilting for several hours a day when tide was low. The homeowners also testified that there were similar houseboats in California and other locations selling for half a million dollars or more.

SVM's attorney made a presentation, noting that the homeowners had not presented appraisals or other evidence, that comparisons to purchase prices were inapt because there was no evidence regarding whether the homeowners paid fair prices. In addition, she noted the lack of evidence regarding how much effort the homeowners expended to sell their boats and that no Claimant testified that she had retained an outside broker. Counsel also disputed that the houseboats lacked value because, she noted, several homeowners had rented their homes to tenants.

## IV.  The Bankruptcy Court's Opinion and Order

The Bankruptcy Court issued an oral opinion and an order. SVM has appealed the portions of the Order that granted general unsecured claims to five different SVM homeowners for loss of value in their homes. The aspects of the Order that SVM has appealed are: (1) Claim # 21 (Paul F. and Sharon Swiercynski),

---

[1] SVM submitted two different copies of the hearing transcript to the Court. The first copy had 27 lines per page and lacked page numbers. The second copy had 25 lines per page and had page numbers. The Court's citations are to the second copy, the pagination of which differs from the first copy.

allowing a general unsecured claim in the amount of $45,250.00;
(2) Claim # 23 (Maryanne and Dennis Rotella), allowing a general
unsecured claim in the mount of $33,000.00; (3) Claim # 24
(Steve Smith), allowing a general unsecured claim in the amount
of $37,450.00; (4) Claim # 25 (John B. Allen), allowing a
general unsecured claim in the amount of $67,000.00; and (5)
Claim # 27 (James A. Sanceciz), allowing a general unsecured
claim in the amount of $33,000.00.[2]

In its oral opinion, the Bankruptcy Court explained its
reasoning. First, the Bankruptcy Court noted that it was
"focusing on the amount of claims without deciding any offsets,
without deciding the claims that the marina may have against
each owner." (Hr'g Tr. 84:12-14.) The Bankruptcy Court also
noted that it had no record of consumer fraud; it had "a record
of failure of responsibility on the part of the marina to
maintain the grounds in good repair over many years." (Hr'g Tr.
97:20-23.) Because the Bankruptcy Court found that there was no
fraud, it also found that there was no basis in the record to
support treble damages. (Hr'g Tr. 98:3-4.)

The Bankruptcy Court focused "on whether the claimants have
claims against the debtor regarding loss of value of their

---

[2] SVM appealed the Sanceciz claim "out of an abundance of
caution" even though SVM and Sanceciz had entered into a consent
order, whereby Sanceciz waived his right to the claim. (SVM Br.
at 23.) Upon remand, the parties should clarify whether the
Sanceciz claim is moot.

property by reason of the actions or omissions of Sea Village
Marina over the many years." (Hr'g Tr. 100:19-22.) The
Bankruptcy Court noted that there was no expert testimony, which
is customary in cases involving proof of value or reductions in
value. (Hr'g Tr. 101:2-7.) But the Bankruptcy Court found that
"the conclusion is inescapable that some loss has been suffered
by these claimants. . . ." (Hr'g Tr. 101:8-10.)

   The Bankruptcy Court made several findings regarding the
marina's general condition. The Bankruptcy Court noted SVM
failed to perform its responsibility to provide its tenants with
"quiet enjoyment and to maintain the property at the appropriate
level of maintenance and repair despite continuous promises. . .
." (Hr'g Tr. 101:21-23.) The Bankruptcy Court held, "Admittedly
the exercise of identifying that loss in each case is arbitrary,
but it's also true that some loss has been established in each
case, and expunging each claim is not warranted." (Hr'g Tr.
101:11-14.) The Bankruptcy Court noted that "potable water has
not been available on the premises for years perhaps back to
2006, maybe even earlier." (Hr'g Tr. 102:4-6.) In addition,
"[t]here is a serious dredging problem causing damage to the
floating homes in various degrees." (Hr'g Tr. 102:6-7.) Finally,
the Bankruptcy Court noted the disrepair of the bulkheads and
docks and problems with the swimming pool and parking lot. (Hr'g
Tr. 102:8-11.) The Bankruptcy Court concluded that "these

conditions caused a reduction in the general habitability of the marina, and certainly the quality of life there." (Hr'g Tr. 12-13.)

The Bankruptcy Court held that the houseboats retained some value because some of the homeowners have successfully rented their homes and because Sanceciz testified that his home was in "pristine" condition. (Hr'g Tr. 103:10-18.)

In terms of Allen's claim, the Bankruptcy Court found that Allen purchased his houseboat in 2003 for approximately $133,900, that the house is now sitting in mud at a severe angle, and that no one is living in the home. (Hr'g Tr. 10320-23.) Allen was able to rent the home for $1,600.00 for one month, July, in 2011. (Hr'g Tr. 104:1-2.) The Bankruptcy Court concluded that "under these circumstances, a 50 percent reduction in our starting point, arbitrary as it is since it was so long ago, would be appropriate to assign as the amount of the claim, so this claim will be $67,000." (Hr'g Tr. 104:11-14.) The Bankruptcy Court later explained that "I've been viewing the various percentages of losses in a relative way" by comparing the different homeowners to each other. (Hr'g Tr. 107:6-7.)

In terms of Rotella's claim, the Bankruptcy Court noted that her husband had purchased the property approximately 30 years ago for $72,000, that she had listed the property "some time ago" at $165,000, and that she had been unable to sell.

13

(Hr'g Tr. 104:17-21.) The Bankruptcy Court held that the $165,000 asking price was the appropriate starting point for consideration of Rotella's claim. The Bankruptcy Court also noted that Rotella had been renting the property for $950 per month for a year. The Bankruptcy Court concluded, "In light of these circumstances, it seems to me that a 20 percent loss in value is appropriate from the $165,000 starting point that produces a claim of $33,000." (Hr'g Tr. 105:8-10.)

For Smith, the Bankruptcy Court used the purchase price of $107,000 in 2004 as a starting point and noted that Smith's home had lost structural integrity and angled on the mud during certain tides. Compared to the other homeowners' losses, the Bankruptcy Court found that a 35 percent loss in value was appropriate for Smith, thus amounting to a $37,450 claim. (Hr'g Tr. 107:10-11.)

For Sanceciz, the Bankruptcy Court began with the 2002 or 2003 purchase price of $110,000 combined with the $55,000 that Sanceciz had invested in improvements. (Hr'g Tr. 107:12-14.) Because the Sanceciz residence was "pristine in condition" but subject to the continuing problems in the marina and unable to be sold, the Bankruptcy Court held that a 20 percent loss was appropriate, resulting in a $33,000 claim. (Hr'g Tr. 15-22.)

And finally, for the Swierczynskis, the Bankruptcy Court began with the purchase price of $156,000 plus $25,000 in

14

improvements. (Hr'g Tr. 107:24.) The Bankruptcy Court noted that
the "boat is somewhat tilted but not too bad" and that the
Swierczynskis use the property infrequently. (Hr'g Tr. 107:25-
108:2.) The Bankruptcy Court assigned a 25 percent loss,
resulting in a claim of $45,250. (Hr'g Tr. 108:3-4.)

## V.   Parties' Arguments on Appeal

Appellant SVM argues that the Bankruptcy Court erred in
allowing the homeowners' general unsecured claims because the
Claimants failed to meet their burden to provide evidence to
substantiate their claims. Appellant argued that the Bankruptcy
Court inserted a loss of value claim into the proceedings, when
the Claimants had only made claims arising under the New Jersey
Consumer Fraud Act, damages for goods and services, or breach of
contract. Appellant argues that the claimants did not present
evidence sufficient to support claims under the New Jersey
Consumer Fraud Act, damage for goods and services, breach of
contract, willful misconduct, or gross negligence. Appellant
noted that there was no third-party appraisal or valuation of
the homes and that the Bankruptcy Court did not address the fact
that floating homes are depreciable assets.

Paul F. and Sharon Swierczynski were the only Claimants who
filed a response to SVM's appeal. The Swierczynskis noted that
they were proceeding pro se, that they have suffered the total

15

market value loss of their floating home, and that they have suffered substantial hardships from the degraded conditions at the marina.

## VI.  Standard of Review

Bankruptcy Rule 8013 provides that a district court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." Fed. R. Bankr. P. 8013. The Rule further provides that "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed. R. Bankr. P. 8013. Essentially, the district court must "review the bankruptcy court's legal determinations de novo, its factual findings for clear error and its exercise of discretion for abuse thereof." In re Am. Pad & Paper Co., 478 F.3d 546, 551 (3d Cir. 2007).

## VII. Analysis

The Bankruptcy Judge has demonstrated considerable skill and patience in dealing with the presentation of these claims by pro se Claimants. The record demonstrates that a plethora of facts and data were amassed in the relatively informal proof

16

hearing. The Bankruptcy Court paid close attention to these details among the five Claimants and promptly rendered a lengthy oral opinion. Perhaps due to the informality of this setting, there are gaps in the resulting oral opinion that make review difficult.

The Court cannot assess either the Bankruptcy Court's legal conclusions or its factual findings absent an opinion that explains more of the Bankruptcy Court's reasoning. See In re J. Allan Steel Co., 336 B.R. 226, 229 (W.D. Pa. 2005) ("I simply cannot determine whether the Bankruptcy Court clearly erred in its factual findings, abused its discretion, or misconstrued the law absent more a more detailed Opinion.") Specifically, the Court requests more explanation regarding the cause of action that serves as the basis for relief, the Claimants' showing of causation, and the Bankruptcy Court's calculation of damages.

### A. Cause of Action

The Court is uncertain as to the legal theory that supported the Bankruptcy Court's allowance of loss of value claims. Appellant argues that "[b]ecause no independent cause of action exists for loss of value, in order to analyze a claim under a loss of value theory, the most relevant and applicable analysis is contained within the case law of the Consumer Fraud Act. . . ." (SVM Br. at 17.) But the Bankruptcy Court

17

specifically disallowed consumer fraud claims. Therefore, a New Jersey Consumer Fraud Act analysis is inapposite.

The Bankruptcy Court noted that it observed "a record of failure of responsibility on the part of the marina to maintain the grounds in good repair over many years." (Hr'g Tr. 97:20-23.) This failure may be the basis of the Claimants' legal cause of action, but the Court is uncertain as to whether the failure is rooted in the marina's contractual obligations, the marina's obligations as a putative landlord, the marina's negligence, the marina's reckless conduct, or some other theory. Absent more explanation regarding the legal basis for the relief allowed, the Court cannot assess whether the Bankruptcy Court misconstrued the law. The Court respectfully asks the Bankruptcy Court to outline the cause of action that serves as the basis for relief and the elements that Claimants proved to establish such cause of action.

**B. Causation**

The Court also requests more explanation regarding the Claimants' showing of causation and, specifically, how much of the loss of value in Claimants' homes is specifically attributable to the marina conditions. For example, in its briefing and at oral argument, Appellant SVM argued that the houseboats should be considered as boats that depreciate in value over time, as opposed to real property that does not

18

depreciate over time. The oral opinion is silent on the issue whether the property at issue is normally a depreciating asset, like most vessels, or whether these houseboats would have likely held their value but for the neglect, actions, or omissions of the marina.

Many of the Claimants referenced Marine Surveyor Cozen's report regarding the value of Smith's boat. Cozen concluded that "[t]aking all of these conditions into account, your floating home has virtually lost most or all of it's [sic] market value." (Cozen letter at 2.) Cozen's letter noted many conditions that reflected his assessment of the houseboat's value. For example, Cozen noted that no other marina or facility on the east coast would accept the floating homes from SVM, but he did not indicate that Appellant SVM is responsible for the fact that the homeowners cannot move the houseboats elsewhere. He also noted that ongoing litigation required that profits from any sale must go directly to SVM for back rent. It appears that the likelihood that sale profits would have to pay back rent impacted Cozen's assessment of Smith's potential sale profits. Cozen also noted that Smith's boat was 30 years old and that it rested on a foundation intended to last 20 years. And he noted that Smith purchased his houseboat at the height of the real estate market bubble.

19

Essentially, the record contains references to many factors that may have caused depreciation in the houseboats' value. The Court requests further explanation of the Bankruptcy Court's findings regarding the extent of the depreciation specifically attributable to the conditions at the marina, as opposed to the percentages that are attributable to the collapse of the relevant market in houseboat properties, the depreciation of a 30-year-old home sitting on a foundation intended to last 20 years, the depreciation of a vessel, the fact that no other marina will accept the houseboats, and the fact that sale proceeds would be lost to litigation over unpaid rent.

**C. Damages**

The Bankruptcy Court acknowledged that its loss of value calculations were "arbitrary" and based on comparisons of the relative damage that each homeowner experienced. Its calculations do not appear to consider the unique characteristics of each home and the expenses incurred by each homeowner in fixing damage, such as corroded pipes, attributable to SVM. Before the Court can determine whether the Bankruptcy Court's factual findings were clearly erroneous, the Court requests more explanation regarding the Bankruptcy Court's reasoning in determining the amount of the claims. The Court does not suggest that it would ever be possible to determine loss of value with mathematical precision; like any verdict,

20

such a determination must reasonably rest upon a preponderance of the credible evidence and it may be derived from reasonable inferences from the evidence.

## VIII.   Conclusion

After careful consideration, the aspects of the Bankruptcy Court's March 16, 2012 Order allowing general unsecured claims for loss of value to the Swiercynskis, the Rotellas, Smith, Allen, and Sanceciz are vacated. The case is remanded to the Bankruptcy Court for further proceedings consistent with this opinion. Specifically, the Court asks the Bankruptcy Court to clarify the legal basis for allowing loss of value claims, to make findings as to whether the Claimants have shown causation of loss, and to explain its reasoning on the amount of damages.

The accompanying Order will be entered.


**December 20, 2012**                    **_s/ Jerome B. Simandle__**
Date                                     JEROME B. SIMANDLE
                                         Chief U.S. District Judge